CITY OF CINCINNATI *v.* CINCINNATI DISTRICT COUNCIL 51,
AMERICAN FEDERATION OF STATE, COUNTY, MUNICIPAL
EMPLOYEES, AFL-CIO ET AL., APPELLANTS; GOLDBERG,
APPELLEE.

[Cite as Cincinnati v. Cincinnati District Council 51
(1973), 35 Ohio St. 2d 197.]

(No. 72-697—Decided July 18, 1973.)

198

*Mr. James C. Paradise,* for appellants.
*Messrs. Goldman, Cole & Putnick, Mr. Jerome Goldman* and *Mr. Mitchell B. Goldberg,* for appellee.

O'NEILL, C. J. This appeal raises serious and difficult questions regarding the powers of courts to punish for contempt of their orders.

It is noted at the outset that both a temporary restraining order issued on January 4, 1970, and the permanent injunction issued on January 6, 1970, enjoined Council 51 "* * * from carrying on a strike and/or picketing against the city of Cincinnati, Ohio." It is not here

contended that the injunction was unlawfully issued, and it is conceded that by striking Council 51 acted in contempt of the injunction. Appellants, however, assert ten propositions of law, in essence challenging the nature and extent of punishment of Council 51 and the International, and the intervention by the intervenor-defendant, appellee herein.

In particular, appellants assert:

(1) That they were denied due process of law by not being put on notice "at any time prior to judgment" that they were being tried for multiple contempts;

(2) That the denial of a motion for specification of the charges is an abuse of discretion in light of the finding of multiple contempts;

(3) That a judgment finding appellants in contempt of the permanent injunction on January 4 and 5 is unsupportable on its face;

(4) That the judgment is without the requisite evidentiary support;

(5) That the court's authority to punish for indirect contempt is limited by R. C. 2705.05 and 2727.12, which sections do not authorize an award of damages;

(6) That since a jury trial may not be had in a contempt proceeding, the awarding of a damage judgment in such a proceeding deprives the appellants of the right to a jury trial in an action for damages in violation of Section 5 of Article I of the Ohio Constitution;

(7) That it is error to permit a person to intervene pursuant to R. C. 733.581 for the purpose of initiating new contempt proceedings where an injunction action instituted by a municipal corporation has been concluded by the entry of final judgment;

(8) That it is improper to assess a fine of $1,000 for each contempt, since R. C. 2705.05 provides for a maximum fine of $500;

(9) That agreement by the city to waive its right to have acts in violation of the injunction adjudged to be in contempt constitutes a defense to a subsequent charge of contempt;

(10) That the proper measure of damages is the actual monetary loss sustained and that since the city reaped a monetary gain, the judgment awarding damages can not stand.

Propositions (1) and (2) relate to the question of whether appellants were adequately notified of the nature of the proceedings against them and will be treated together. Propositions (3) and (4) question the degree of evidence necessary to support the judgment below and will be treated together. Propositions (5), (6), (8) and (10), relating to the award of damages and the size of the fine, will also be treated together. The remaining propositions will be treated separately.

I.

Proposition of law (7).

R. C. 733.581 provides in pertinent part:

"In any civil action or proceeding involving the public interest the court shall grant the application of any person to intervene if the court believes that the public interest will be better protected or justice will be furthered."

That statute has not been previously construed by this court. It is apparent, however, that the granting or withholding of permission to intervene is within the sound discretion of the trial court.

Unless the trial court is shown to have abused that discretion, this court will not disturb its decision.

The record indicates that the application to intervene was filed on February 6, 1970, subsequent to declarations by the officers of the city expressing an intention to dismiss the contempt proceedings arising from violations of the permanent injunction. The trial court conducted a hearing on the application to intervene, during which counsel for the city protested the intervention and expressed the city government's desire to terminate the proceedings. They argued, in essence, that it was the responsibility of the public officials to determine what course of action was in the best public interest, and that " * * * at best, Mr. Gold-

berg is here to question the handling of this case by a solicitor.''

That argument, which challenges the standing of a taxpayer to question discretionary decisions of government officials by intervention in litigation, is relied upon by appellants in this court. The appellee argued that the government's position failed to protect the interests of the people of Cincinnati. He contended that to permit the contempt of appellants to go unpunished would encourage disrespect for orders of the courts. Further, he contended that the city had suffered substantial damage as a result of the strike, which would not be recompensed should the contempt proceeding be dismissed.

The argument of counsel for the city clearly fails to meet the contentions raised by the appellee. While it may be conceded that municipal officials are invested with broad discretion to decide matters of public interest, this discretion is not entirely unchecked. The General Assembly has seen fit to provide certain procedures through which taxpayers of a municipality may question the government's decisions in matters of public interest. One of these procedures is provided in R. C. 733.581, which permits taxpayers to present their views on public questions to the courts in actions in which the municipality is a party.

It is difficult to conjure matters of greater public interest than the preservation of city services or the maintenance of respect for the lawful orders of the courts. Where litigation touches both matters, it is not an abuse of discretion to permit intervention by a taxpayer.

II.

Propositions of law (1) and (2).

Appellants argue that they were denied due process of law in that they were not notified that the proceeding against them involved multiple contempts. In this connection, appellants further complain that ''* * * the denial of a motion for specification of the charges is an abuse of discretion * * *.''

Proceedings in contempt are *sui generis* in the law.

They bear some resemblance to suits in equity, to criminal proceedings and to ordinary civil actions; but they are none of these. Contempt proceedings are means through which the courts enforce their lawful orders. The power to punish for contempt is said to be inherent in the courts and to exist independently from express constitutional provision or legislative enactment. See *State* v. *Local Union 5760* (1961). 172 Ohio St. 75, 173 N. E. 2d 331. The nature of contempt proceedings can vary greatly. Some are summary; others involve notice and hearings. Generally, there is no jury trial; but where a long term of imprisonment is involved a jury trial may be a requisite.

What constitutes due process in a contempt proceeding depends to a large extent upon whether the contempt is direct or indirect, and whether it is civil or criminal. The distinction between these alternatives is far from clear. It is said that direct contempt takes place in the presence of the court, and indirect contempt is all other contempt. Yet, in *Local Union 5760, supra,* this court held that "interference with a court officer in his attempt to execute court process constitutes direct contempt in the constructive presence of the court," and that "courts, in their sound discretion, have the power to determine the kind and character of conduct which constitutes direct contempt of court." The court arrived at this holding despite a statute which provided that "Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment or command of a court or an officer" was indirect contempt.

The distinction between direct and indirect contempt is important. Both procedural and substantive rights are affected. Direct contempt is generally dealt with summarily, whereas it has been stated that statutory procedures must be followed in indirect contempt proceedings. See *State* v. *Local Union 5760, supra; In the Matter of Lands* (1946), 146 Ohio St. 589, 67 N. E. 2d 433.

The present appeal involves the type of proceeding traditionally viewed as indirect contempt. The contempt took place out of the presence of the court. Furthermore,

there was no interference with an officer of the court in his attempt to execute court process, *viz.*, there was no direct contempt in the constructive presence of the court.

R. C. 2705.03 sets forth the procedure which must be followed in indirect contempt proceedings. That section, *inter alia,* provides that "a charge in writing shall be filed with the clerk of court." Appellants do not deny that a charge was filed, but they contend that neither the show cause order nor the affidavit in support thereof apprised them that multiple contempts were charged and that they were thereby denied due process of law.

The function of written notice is to apprise the defendant of the charges against him so that he is able to prepare his defense. See *Foutty* v. *Maxwell* (1962), 174 Ohio St. 35, 186 N. E. 2d 623. The show cause order here involved apprised the appellants of both the nature of the proceeding (civil contempt) and the reason for the proceeding (violation of the permanent injunction previously entered). That the order did not mention that 37 contempts would be punished did not work prejudice against the appellant unions. Each of these separate contempts was the same as the others, *i. e.,* that the appellants conducted a strike in violation of the permanent injunction. Furthermore, appellants were certainly aware of the number of days they remained on strike.

Appellants strenuously assert that they were prejudiced by lack of notice. Nowhere, however, do they indicate the precise nature of this prejudice. The most that appellants assert is that "appellants, not having been advised that they were charged with thirty-seven separate contempts, made no effort to defend against such a charge." This argument is sound so far as it goes, but it does not go far enough. No evidence was introduced or argument advanced to show how appellants would have defended differently had they been fully aware that 37 contempts were involved. Although appellants argue that prejudice could have arisen, they totally fail to demonstrate that prejudice actually arose in this case.

The motion which appellants here label "a motion for specification" was properly overruled for these same reasons. The motion was first made orally at the commencement of trial: "Move to dismiss on the ground that the affidavit of the motion for order to show cause and the order to show cause itself does not apprise the parties affected with any information as to the act which they are alleged to have committed which is said to be in contempt of the court's permanent injunction in this case." As noted previously, the show cause order advised the appellants that they were charged with violation of a permanent injunction which enjoined appellants "* * * from carrying on a strike and/or picketing against the city of Cincinnati." Such notice was clearly sufficient to apprise the appellants of the charge against them and to enable them to prepare a defense.

### III.

Propositions of law (3) and (4).

Appellants argue that the judgment of the trial court finding them in contempt on January 4 and 5 was erroneous on its face, since the permanent injunction was not issued until January 6, 1970. They contend further that the entire judgment of the trial court lacks the requisite evidentiary support.

Since the show cause order spoke only of the "permanent injunction" and the "permanent injunction" was not issued until January 6, 1970, it was improper to fine appellants for acts occurring on January 4 and 5 of 1970. That a temporary restraining order had been issued on January 4, 1970, does not change this result as violation of that restraining order was not alleged in the show cause order. Furthermore, the record reveals that appellant Council 51 had already been fined for violation of the temporary restraining order in a proceeding on January 7, 1970, thus rendering that issue *res judicata* as to Council 51.

Appellants' argument that the trial court's judgment lacked requisite evidentiary support is directed primarily to the finding against the appellant International. Indeed, counsel for the appellants admits in its brief to this

court that "There is no question but that Council 51 supported the strike from beginning to end."

Appellants stress that the judgment herein must be supported by "clear, positive, and convincing" evidence, citing *Loney* v. *Hall* (1917), 8 Ohio App. 154. However, that case also proposed that "The judgment of a trial judge who has passed upon the sufficiency and weight of the evidence will not be disturbed, where the evidence is such that different minds might reach different conclusions." Furthermore, it is well settled that this court does not weigh evidence. *E. g.*, *State* v. *Wilson* (1972), 30 Ohio St. 2d 199, 283 N. E. 2d 632. This court, however, will examine the record to determine whether the requisite degree of proof has been met. *Cincinnati Motor Transp. Assn.* v. *Lincoln Hts.* (1971), 25 Ohio St. 2d 203, 206, 267 N. E. 2d 797.

Although this court is not bound by *Loney*, the degree of proof required by that case has been met herein with respect to the judgment against the International. The record reveals that the president of the International was notified within 24 hours after the strike was called. Thereafter, the International sent three representatives to Cincinnati. These International representatives attended meetings with city representatives, wherein the city was advised that "the men would not return to work until an agreement satisfactory to the Unions had been reached." The director of Council 51 testified that he contacted the International "from time to time" as the strike was continuing, and that the president of the International advised him that money would be sent to the strikers. It was also testified that the International did, in fact, send some $20,-000 to Council 51 for "hardship cases." Testimony of a newspaper reporter present at many of the union meetings revealed that at least one of the International representatives made public statements in support of the strike, and that "every union leader I heard speak to a large body of people, publicly supported the strike."

From the foregoing testimony and from the record as a whole, a majority of this court is of the view that the

trial court correctly found that the International aided and encouraged the strike in violation of the permanent injunction.

## IV.

Propositions of law (5), (6), (8) and (10).

Appellants contend that the award of damages herein was unlawful and unconstitutional. They also contend that since the measure of damages is actual monetary loss and that since the city saved a substantial sum in payroll, the city suffered no actual monetary loss.

The constitutional objection to the award of damages arises under Section 5 of Article I of the Ohio Constitution, which provides:

"The right to trial by jury sh.  .e inviolate, except that, in civil cases, laws may be p.  ed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

Appellants argue that "since a jury trial may not be had in a contempt proceeding, the awarding of a damage judgment in such a proceeding deprives the defendant of his right to a jury trial in an action for damages in violation of Article 1, Sec. 5 of the Ohio Constitution."

That argument is untenable. It is well settled that "* * * conduct can amount to both civil and criminal contempt," *United States* v. *United Mine Workers of America* (1947), 330 U. S. 258, 299, and that both aspects may be dealt with in the same proceeding. See, also, *Cromaglass Corp.* v. *Ferm* (M. D. Pa. 1972), 344 F. Supp. 924. It is also well settled that "judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, *and to compensate the complainant for losses sustained.*" *United Mine Workers, supra,* at 303. See, also, *N. L. R. B.* v. *San Francisco Typographical Union* (C. A. 9, 1972), 465 F. 2d 53; *Windham Bank* v. *Tomaszczyk* (1971), 27 Ohio St. 2d 55, 271 N. E. 2d 815; and *Dept. of Pub. Health* v. *Cumberland Cattle Co.* (Mass. 1972), 282 N. E. 2d 895.

The present case involves both civil and criminal

aspects. The award of damages to the city of Cincinnati is the civil aspect, and such award is proper in a contempt proceeding to compensate for losses. Furthermore, it is clear that Section 5 of Article I "* * * only guarantees the right of trial by jury in those cases where it existed previous to its adoption." *Belding* v. *State, ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N. E. 301. There exists no right to trial by jury in contempt proceedings, except perhaps where lengthy jail sentences are likely. Such is not the case here.

Appellants assert that the award of damages was unlawful as exceeding the court's authority to punish for contempt under R. C. 2705.05 and R. C. 2727.12. Similarly, they contend that it was improper to assess a fine of $1,000 for each contempt since the maximum fine allowed under R. C. 2705.05 is $500.

Assuming, *arguendo*, that the General Assembly may limit the power of the courts to punish for contempt of their lawful orders, it is apparent that the fines in the present case are within the limits of R. C. 2705.05. The $500 maximum fine under that statute applies to a single contempt by a single contemner. Here there are two contemners, Council 51 and the International; thus, a $1,000 fine against both for each day of the strike would be within the statutory limit.* It is, however, highly doubtful that the General Assembly may properly limit the power of a court to punish for contempt. Although it is conceded that the General Assembly may prescribe procedure in indirect contempt cases, the power to punish for contempt has traditionally been regarded as inherent in the courts and not subject to legislative control. See *State* v. *Local Union 5760, supra* (172 Ohio St. 75). The Courts of Common Pleas are established by Section 1 of Article IV of the Ohio Con-

---

*It is well settled that separate fines may be assessed for each day in which a court's order is violated. *New Jersey* v. *New York* (1933), 290 U. S. 237; *Madden* v. *Grain Elevator, Flour & Feed Mill Wkrs.* (C. A. 7, 1964), 334 F. 2d. 1014; *Meredith* v. *Fair* (C. A. 5, 1962), 313 F. 2d 532; *Meredith* v. *Fair* (C. A. 5, 1962), 313 F. 2d 534; *Commonwealth* v. *Hudson* (1943), 315 Mass. 335, 52 N. E. 2d 566.

stitution not by the General Assembly, and, hence, are co-equal branches of the government. Those courts are vested with the judicial power of the state, which includes the power to enforce lawful orders by contempt proceedings.

Respecting the award of a portion of the fines assessed herein as damages to the city of Cincinnati, appellants argue that R. C. 2727.12 speaks only of "restitution" to the injured party, and that damages are not restitution. While at common law restitution denoted return of a specific thing or condition, modern usage of that term includes restoration to its rightful owner and also compensation for loss or injury caused to another. 66 American Jurisprudence 2d 942, Restitution and Implied Contracts, Section 1. In any event, as previously discussed, compensation of the injured party has traditionally been a function of civil contempt proceedings. It was, therefore, proper for the trial court to award damages to the city of Cincinnati to compensate for losses sustained during the strike.

Appellants contend that the city sustained no loss as a result of the strike, for the reason that it saved substantial sums in payroll expenses. This argument is wholly untenable. Obviously, the city sustained a substantial loss of vital services as a result of the strike. Streets were left unrepaired, garbage remained uncollected and sewage was untreated. Millions of gallons of raw sewage were poured into the Ohio River. Although the precise cost of this loss of services can never be accurately determined, the injury occasioned thereby was no doubt substantial.

In any event, the record reveals that the excess cost of using supervisory personnel to operate the waterworks was $63,000, not including fees of $20,000 paid to outside contractors who provided services normally performed by city employees. This alone is sufficient to justify the award of $13,000 in compensation to the city.

## V.

Proposition of law (9).

Finally, appellants argue that by agreement or by conduct the city officials waived their right to prosecute for

contempt and that such waiver operates as a defense to this proceeding.

The Court of Appeals found that this argument is not supported by the record. Assuming, *arguendo*, that it is so supported, however, adoption of appellants' view would nullify R. C. 733.581. That statute, as previously discussed, operates as a check upon the discretion of city officials when matters of public interest are in litigation. This check would be a farce should the conduct of city officials be held a defense to actions involving questions of public interest.

In support of their argument, appellants quote from 17 Corpus Juris Secundum, 103, Contempt, Section 39, that:

"As a rule, the fact that the contempt charged is the result of the direct or implied advice or consent of complainant is a sufficient justification therefor * * *."

Appellants, however, have not quoted far enough. That section continues:

"* * * although it has been held that an arrangement between the parties or their attorneys is not an excuse for disobedience of a court order. It has been further held that complainant's consent to the violation of a court order must be of a decided character to be effective."

Tested by those principles, it is apparent that the actions of the city officials or any agreement made by them does not operate as a defense to the present action.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed in all respects, except that it is reversed with respect to the finding that appellants were in contempt of the permanent injunction on January 4 and January 5, 1970.

*Judgment affirmed in part and reversed in part.*

HERBERT, STERN and P. BROWN, JJ., concur.
CORRIGAN and CELEBREZZE, JJ., dissent.

W. BROWN, J., concurs in paragraphs one and two of the syllabus but dissents from paragraphs three and four of the syllabus and from the judgment.

CORRIGAN, J., dissenting. As the majority suggest in their opinion, this appeal raises serious questions. They further point to difficult questions. They fail to find simple answers to at least one of the difficulties that seems to be troublesome to them.

R. C. 733.581 provides, in pertinent part:

"In any civil action or proceeding involving the public interest the court shall grant the application of any person to intervene if the court believes that the public interest will be better protected or justice will be furthered."

It is noted in the majority opinion that this statute has not been previously construed. They add that "It is apparent, however, that the granting or withholding of permission to intervene is within the sound discretion of the trial court."

So that the key question obviously is: Does a contempt proceeding constitute a civil action or proceeding under R. C. 733.581? The case authorities answer negatively.

While contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our government proceedings to punish such offenses have been regarded as *sui generis* and not criminal prosecutions within the Sixth Amendment to the United States Constitution, or common understanding.

A contempt proceeding is *sui generis. Blackmer* v. *United States* (1932), 284 U. S. 421; *Blankenburg* v. *Commonwealth* (1930), 272 Mass. 25, 172 N. E. 209.

Contempt proceedings are *sui generis*, being neither "civil actions" nor "criminal prosecutions" within ordinary meaning of terms. *Bowles* v. *United States* (C. A. Md. 1931), 50 F. 2d 848, 850.

*Sui generis*, translated, means: Of its own kind; peculiar to itself.

Ohio lines up with the United States Supreme Court in holding that a contempt proceeding is a special proceeding. *Iron Moulders Union* v. *I. & E. Greenwald Co.* (1906), 4 N. P. (N. S.), 161, 164.

A contempt proceeding is not a civil action but a special statutory proceeding. See *Niemes* v. *Niemes* (1917), 97 Ohio St. 145.

There is a catholicity of authority on the same point from many jurisdictions.

The majority agree that such proceedings are *sui generis*. It then follows inescapably that the trial court had no authority under R. C. 733.581 to grant the application to intervene because the contempt proceeding was not a civil action or proceeding and the trial court abused its discretion in granting such motion to intervene.

Accordingly, for this reason alone, the judgment of the Court of Appeals should be reversed.

CELEBREZZE, J., concurs in the foregoing dissenting opinion.

WILLIAM B. BROWN, J., dissenting. I dissent from the judgment and from the last two paragraphs of the syllabus.

The court abused its discretion in levying against local Council 51 and the parent union fines totalling $37,000 ($1,000 for each of 37 days).

For the violation of an injunction which amounts to contempt, the violators can be fined pursuant to R. C. 2705.05 or R. C. 2727.12, or both. *Hayes* v. *Hayes* (1919), 11 Ohio App. 10. R. C. 2705.05 provides:

"Upon the day fixed for the trial in a contempt proceeding the court shall investigate the charge, and hear any answer or testimony which the accused makes or offers.

"The court shall then determine whether the accused is guilty of the contempt charge. If it is found that he is guilty, he may be fined not more than five hundred dollars or imprisoned not more than ten days, or both."

Since there are two defendants who admitted to violating the injunction, fines totalling $1,000 could have been levied. R. C. 2727.12, as will be shown hereinafter, does not apply. So the levy of $37,000 constituted an abuse of discretion.

212

The majority attempts to justify the fines on four alternate grounds: (1) that each day the strikers were out of work constituted a separate violation of the court order; (2) that the power of the court to impose punishment for contempt cannot be limited by the General Assembly; (3) that civil as well as criminal contempt is involved; and (4) that R. C. 2727.12, allowing restitution for the violation of an injunction, applies here.

As to the 37 violations, the injunction granted January 6, 1970, enjoined the defendants "from carrying on a strike and/or picketing against the city of Cincinnati, Ohio." When the workers did not go to work the following day, they violated the injunction because they were "carrying on a strike." They remained in violation of the injunction until they returned to work. So, there was a violation by the local union and the parent union; and, according to R. C. 2705.05, they were subject to a total of $1,000 in fines. The majority assumes that there was a separate violation of the injunction for each day the workers were not at work. Why not compute a violation for each hour the workers were not working? How is one day decided upon as the period for which a new violation is computed? There is no indication in the statute nor in the Ohio case law to support this novel interpretation.

Secondly, the majority doubts that contempt power can be limited by the General Assembly. As regards direct contempt, the court's power cannot be limited. *State* v. *Local Union 5760* (1961), 172 Ohio St. 75, 82. In the instant case, however, there is indirect contempt.

Indirect contempt involves actions committed outside the presence of the court, tending to obstruct the due and orderly administration of justice. *In the Matter of Lands* (1946), 146 Ohio St. 589, 595. The activity in the instant case did not occur in the presence of the court; nor did it fall within the exceptions of *Hale* v. *State* (1896), 55 Ohio St. 210, where a witness under subpoena to testify was removed outside of the court's process, or of *State* v. *Local Union 5760* (1961), 172 Ohio St. 75, where a sheriff was

prevented from serving a writ of replevin. Indirect contempt is involved here, so the statutory provisions for levying fines must be followed.

The invocation of the court's summary power for direct contempt is an awesome power that the court must be cautious in using; it should be restricted to activity that threatens the integrity or the very functioning of the judicial process. The illegal activity here admittedly was contemptuous; but it was not of a nature that would justify the court's use of its summary and arbitrary power. I see no reason to extend that power to our situation.

Thirdly, civil contempt is that judicial power used to bring about compliance with lawful court orders. Paragraph three of the syllabus in *Windham Bank* v. *Tomaszczyk* (1971), 27 Ohio St. 2d 55, provides:

"The purpose of sanctions in a case of civil contempt is to compel the contemnor to comply with lawful orders of a court * * *."

The trial in the instant case was held at a time long after the strike was settled. There was no possibility of compelling the contemnor to comply, so there could be no civil contempt. Criminal contempt alone is involved here.

Both *Windham Bank* v. *Tomaszczyk, supra,* and *United States* v. *United Mine Workers of America* (1947), 330 U. S. 258, are cited as support for the dual, criminal and civil, aspects of this case. Those two cases are readily distinguishable. In those cases, the contemptuous activity continued until the date of trial, and the court could have imposed the sanctions of civil contempt to effect compliance; in the instant case the strike was settled, and there was no purpose for using civil contempt.

Lastly, it is claimed that the fines could be justified under R. C. 2727.12, which provides:

"Upon being satisfied, by affidavit, of the breach of an injunction or restraining order, the court or judge who issued such injunction or order may issue an attachment against the guilty party who shall pay a fine of not more than two hundred dollars, for the use of the county, *make*

*immediate restitution to the party injured,* and give further security to obey the injunction or restraining order. In default thereof, said party may be committed to close custody until he complies with such requirement, or is otherwise discharged.'' (Emphasis added.)

The Restatement of the Law, Restitution, provides, at page 12:

"Section 1.

"A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

The connection of restitution and unjust enrichment is explained later in the restatement at pages 595-96, as:

"Actions for restitution have for their primary purpose taking from the defendant and restoring to the plaintiff something to which the plaintiff is entitled, or if this is not done, causing the defendant to pay the plaintiff an amount which will restore the plaintiff to the position in which he was before the defendant received the benefit."

In this case, the unions have not received a windfall; they have not been enriched at all; in fact they are poorer, as a result of the strike.

Therefore, the amount levied in fines should have been limited to a total of $1,000.